UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------------X
CHRISTOPHER HOEY,

Plaintiff,

No.: 12-CV-04935 (GRB)

- against -

COUNTY OF NASSAU and MARJORIE BLIEKA, in her official and individual capacities,

Defendants.
----------------------------------------------------------------------X

**PLAINTIFF'S MEMORANDUM OF LAW**
**<u>IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>**

Leeds Brown Law, P.C.
*Attorneys for Plaintiff*
One Old Country Road, Ste 347
Carle Place, NY 11514
516-873-9550

# TABLE OF CONTENTS


Page

TABLE OF AUTHORITIES ........ ii

PRELIMINARY STATEMENT ........ 1

STATEMENT OF FACTS ........ 2

SUMMARY JUDGMENT STANDARD ........ 5

ARGUMENT

I. DISABILITY DISCRIMINATION CLAIMS ........ 6

II. PLAINTIFF WAS SUBJECTED TO AN ADVERSE EMPLOYMENT ACTION ........ 10

III. PLAINTIFF IS QUALIFIED AND NO LEGITIMATE REASON EXISTS FOR HIM TO REMAIN ON RESTRICTED ASSIGNMENT ........ 12

IV. BLIEKA IS A PROPER DEFENDANT ........ 18

V. QUALIFIED IMMUNITY IS NOT AVAILABLE ........ 19

VI. THE COURT SHOULD EXERCISE SUPPLEMENTAL JURISDICTION OVER PLAINTIFF'S STATE LAW CLAIMS ........ 20

CONCLUSION ........ 20

# TABLE OF AUTHORITIES

Cases

Alexiadis v. New York Coll. of Health Professions,
891 F. Supp. 2d 418 (E.D.N.Y. 2012)....9
Brennan v. New York City Police Dep't,
141 F.3d 1151 (2d Cir. 1998)....13
Celotex Corp. v. Catrett,
477 U.S. 317, 106 S. Ct. 2548 (1986)....6
City of New York,
79 F.3d 265 (2d Cir. 1996)....19
Cyrus v. Papa's Dodge, Inc.,
10 CV 21, 2012 WL 1057310 (D. Conn. Mar. 28, 2012)....7, 8
Eastway Cons Corp. v. City of N.Y.,
762 F.2d 243 (2d Cir. 1985)....6
Ebbert v County of Nassau,
No. 05-CV-5445, 2009 WL 935812 (E.D.N.Y. Mar. 31, 2009)....12
Egelston v. State Univ. College,
535 F.2d 752 (2d Cir. 1976)....5, 6
Fierro v. City of N.Y.,
2009 WL 2223067 (2d Cir. July 27, 2009)....19
Galabya v. New York City Bd. of Educ.,
202 F.3d 636 (2d Cir. 2000)....10
Gallo v. Prudential Residential Serv.,
22 F.3d 1219 (2d Cir. 1994)....5, 6
Gentile v. Potter,
509 F. Supp. 2d 221 (E.D.N.Y. 2007)....10
Hargrave v. Vermont,
340 F.3d 27 (2d Cir. 2003)....12
Harlow v. Fitzgerald,
457 U.S. 800 (1982)....19
Howley v. Town of Stratford,
217 F.3d 141 (2d Cir. 2003)....16
Jackson v. City of New York,
CV 06-1835, 2011 WL 1533471 (E.D.N.Y. 2011)....13
Kessler v. Westchester County Dep't of Soc. Servs.,
461 F.3d 199 (2d Cir. 2006)....10
Krasner v. City of New York,
2013 WL 5338558 (S.D.N.Y. Sept. 23, 2013)....13
Levine v. Smithtown Cent. Sch. Dist.,
565 F. Supp. 2d 407 (E.D.N.Y. 2008)....6, 7
Lido, LLC,
571 F. Supp 2d. 370 (E.D.N.Y. 2008)....7
Lovejoy-Wilson v. NOCO Motor Fuel, Inc.,
263 F.3d 208 (2d. Cir 2001)....13

McCowan v. HSBC Bank USA, N.A., 689 F. Supp. 2d 390 (E.D.N.Y. 2010) ........ 6, 10, 16
N.Y.S. and Local Retirement System, 707 F.3d 144 (2d Cir. 2013) ........ 8
Nelson v. City of New York, 2013 WL 4437224 (S.D.N.Y. Aug. 19, 2013) ........ 13, 15, 18
Pierre v. Napolitano, 11 CIV. 4935, 2013 WL 3835428 (S.D.N.Y. July 24, 2013) ........ 11
Richardson v. Selsky, 5 F.3d 616 (2d Cir. 1993) ........ 19
Robischung-Walsh v. Nassau County Police Dep't, 699 F. Supp. 2d 563 (E.D.N.Y. 2010) ........ 16
Santiago v. New York City Police Dep't, 05CIV3035, 2007 WL 4382752 (S.D.N.Y. Dec. 14, 2007) ........ 11
Schwapp v. Town of Avon, 118 F.3d 106 (2d Cir. 1997) ........ 6
Silverstein v. Lawrence Union Free Sch. Dist., CV 10-993, 2011 WL 1261122 (E.D.N.Y. Feb. 15, 2011) ........ 18
Simms v. City of New York, 160 F. Supp. 2d 398 (E.D.N.Y. 2001) ........ 13
Sista v. CDC Ixis North America, Inc., 445 F.3d 161 (2d Cir. 2006) ........ 12
Tomka v. Seiler Corp., 66 F.3d 1295 (2d Cir. 1995) ........ 18
Trans World Airlines, Inc. v. Thurston, 469 U.S. 111 (1985) ........ 16
Waters v. Churchill, 511 U.S. 661, 114 S. Ct. 1878 (1994) ........ 6
Weixel v. City of New York, 287 F.3d 138 (2d Cir. 2002) ........ 8
White v. Sears Roebuck & Co., 07-CV-4286, 2009 WL 1140434 (E.D.N.Y. Apr. 27, 2009) ........ 7

## Statutes

42 U.S.C. § 12102(4)(B) ........ 7
42 U.S.C. § 12102(4)(A) ........ 7

## Regulations

29 C.F.R. § 1630.2(j)(1)(iii) ........ 7
29 C.F.R. § 1630.2(j)(1)(vii) ........ 7
29 C.F.R. § 1630.2(r) ........ 12
9 N.Y.C.R.R. § 466.11(g)(2) ........ 12

## PRELIMINARY STATEMENT

Plaintiff, Christopher Hoey, commenced this action on September 28, 2012, based on the conduct of Defendant County of Nassau, which violated the Americans with Disability Act, as amended ("ADA"), and the New York State Executive Law, Human Rights Law, § 290 *et seq*. ("NYSHRL"), and the conduct of Marjorie Blieka which violated the NYSHRL. No claim was asserted against Blieka under the ADA, but to the extent the Complaint is interpreted as asserting such claim, Plaintiff withdraws it. The discovery period has concluded and Defendants move for summary judgment.[1] Plaintiff submits this memorandum of law in opposition to Defendants' motion, along with the Declaration of Matthew Weinick.

Summary judgment cannot be granted because material issues of fact exist. Defendants argue they placed Plaintiff on restricted assignment without weapons because his bipolar disorder causes them safety concerns. However, their reason is undermined by the undisputed fact that the NCPD reassigned Plaintiff to a position where he has the keys to lockers in which other officers store their weapons. Further, supervisors, such as lieutenants and sergeants, leave their weapons in Plaintiff's unlocked desk drawer when they interview prisoners. Thus, Plaintiff has unfettered access to weapons while at work, supervisors know about his access, and the NCPD has not taken steps to remove Plaintiff's access to weapons. Accordingly, a reasonable juror could reject Defendants' argument that they are concerned about Hoey having guns because of safety concerns, because they condone his continued access to guns. Moreover, their argument is legally flawed, as discussed below.

[1] One outstanding deposition remains to be taken, that of Plaintiff's treating therapist.

**STATEMENT OF FACTS**

In 2008, Plaintiff was hired as a police officer with the Nassau County Police Department ("NCPD") (Hoey 7).[2] After completing training, Plaintiff was assigned to patrol with duties including: patrolling an assigned area, gathering information and evidence for investigations, locating and arresting wanted persons, directing traffic, engaging in high speed vehicle pursuits, rescuing individuals in emergencies, and maintaining an assigned vehicle and equipment. (Hoey 7, 37; Ex. 4; Beccaris 48).

On November 17, 2009, Plaintiff experienced a manic episode (a psychiatric emergency), and voluntarily went to St. Joseph's Hospital by car, driven by his wife. (56.1 Counter ¶ 2). He was not violent towards his wife and, although he had access to his department weapon at the time of the emergency, he did not try to access it and he did not use it. (56.1 Counter ¶ 2). From St. Joseph's, Plaintiff was transported to the Nassau University Medical Center ("NUMC"), where he was placed in restraints as a precautionary measure due to his large size, and was given sedatives.[3] (56.1 Counter ¶ 4, 5). Later that day, Plaintiff was transferred to South Oaks Hospital, where he remained for treatment until he was discharged on November 23, 2009. (56.1 ¶ 7).

While hospitalized, the NCPD placed Plaintiff on sick leave, per Department policy. (56.1 ¶ 14-15). Also per NCPD policy, Sergeant Robert Beccaris of the Medical Administration Office, went to Hoey's home on the day of his hospitalization to remove his weapons and police ID. (56.1 ¶ 14-15). Beccaris was in the house for 15-20 minutes and did not see the home in disarray. (Beccaris 20). He spoke with Hoey's wife who told him that she was concerned about Hoey's job,

---

[2] Hereinafter, all citations to deposition testimony will be as follows: ([Last name of deponent] [page number]). Also, citations to numbered exhibits reference exhibits attached to Weinick Declaration and references to lettered exhibits are those attached to the Leventhal Declaration.

[3] Notably, Plaintiff's South Oaks discharge summary states there was no need to sedate him at NUMC. (56.1 Counterstatement ¶ 5).

but she was not concerned about her safety. (Becarris 20). She looked "upset," but "put together" and she did not appear injured. (Becarris 20).

At South Oaks, Plaintiff was diagnosed with bipolar affective disorder by Dr. Greenberg. (56.1 Counter ¶ 9; Greenberg 71-72). His illness manifested itself with a psychotic episode. (Greenberg 72). Further, Plaintiff's condition, when active, affects his "normal sleep patterns, appetite, focus, concentration, and the ability to perceive pleasure." (Greenberg 73). Plaintiff was treated with medication (Depakote), and remains on it. (56.1 ¶ 11).

On December 2, 2009, Plaintiff met with Dr. Greenberg for a follow-up appointment. (56.1 Counter ¶ 17). Dr. Greenberg noted: "[Plaintiff] has been under my care since November 17, 2009 for the treatment of Bipolar Affective Disorder. He is being prescribed Depakote and is doing well on this medication. His prognosis is excellent . . . It is my professional opinion that he may return to full duty without restrictions." Id. (emphasis added). Dr. Greenberg meant that Hoey could return to work with his weapon. (Greenberg 39, 57).

Dr. Greenberg participates in POPPA, a program in which he evaluates New York City police officers' fitness to return to duty and to possess and utilize firearms. (Greenberg 15). He once recommended that an officer not be returned his firearms because that officer's mood was not stable and could vary over a very short period of time. (Greenberg 19). Dr. Greenberg also had experience evaluating individuals' fitness for firearms when he worked for the Veterans' Administration Hospital. (Greenberg 20).

On December 8, 2009, Plaintiff met with a NCPD psychiatrist, Dr. Robert Klugman, who recommended that Plaintiff be returned to work on restricted duty, without weapons, and that he be re-evaluated in April 2010. (56.1 Count ¶ 18).

On March 4, 2010, Dr. Greenberg again recommended that Hoey was "fit to return to work," with a weapon. (Ex. 5 (further noting Hoey is "compliant with both his appointments and medication"); Greenberg 39). On April 20, 2010 Dr. Klugman reevaluated Hoey and cleared him to return without restrictions, noting: "there is no psychiatric contraindication to [Hoey's] returning to full duty status with weapons." (56.1 Counter ¶ 20, 24). Accordingly, in April 2010, Plaintiff requested to be returned to full duty. (56.1 ¶ 21). Beccaris, Lieutenant Thomas Meagher, and Deputy Commissioner Thomas Krumpter denied the request, allegedly due to the proximity of the incident, and for "legitimate safety concerns." (56.1 Counter ¶ 21, 23, 42; Ex. 6 ¶ 5). Notably, the denial was made by laypersons without regard to any individualized assessment of Plaintiff's mental health condition, and, indeed, in contravention of two doctors' recommendations. (56.1 Counter ¶ 21, 42).

In June 2011, Plaintiff again requested to be returned to full duty. (56.1 Counter ¶ 29). Beccaris, Meagher, and Krumpter disliked Dr. Klugman's opinion that Plaintiff could be returned, and did not use him to re-interview Plaintiff. (56.1 Counter ¶ 29; Ex. 6 ¶ 5). Instead, Blieka evaluated him. (56.1 Counter ¶¶ 29, 43). Plaintiff characterizes this interview as being "conducted like a criminal investigation," noting that he was required to agree that anything he said during the appointment could be used against him, and that Blieka told him he "should have never been hired by the Nassau County Police Department." (56.1 Counter ¶ 29).

Blieka found that Plaintiff was clinically stable, but nevertheless, she recommended Plaintiff continue on restricted assignment, without weapons. (56.1 ¶ 40). Blieka disregarded Dr. Greenberg's opinion that Plaintiff should be returned to full duty. (56.1 Counter ¶ 39). Also, she did not review any of the ongoing treatment records upon which Dr. Greenberg's recommendation was based and which would have given her a more complete picture of Hoey's current psychiatric

state. (56.1 Counter ¶ 39). Likewise, she never had any discussions with Dr. Greenberg about Plaintiff's medical condition. (Counter ¶ 39).

Krumpter adopted Blieka's recommendation and denied Hoey's request to return to full duty. (56.1 ¶ 41). Although the Police Commissioner makes the ultimate decision on fitness for duty, the decision is merely a rubber stamp. (56.1 Counter ¶ 42, 43).

To date, Plaintiff has been compliant with his medication, he has experienced no adverse side effects, and his mental health has been good as a result of it. (56.1 Counter ¶ 11; Greenberg 72). He has not had any manic episodes or mental health emergencies since November 2009 and he has been symptom free. (Greenberg 61-62). However, Plaintiff's weapons have not been returned to him and he remains on restricted assignment. (56.1 ¶ 22).

Assignment to restricted fundamentally changed Hoey's job responsibilities. Because Plaintiff cannot work a patrol where the overwhelming majority of officers work, his overtime opportunities have substantially diminished. (56.1 Counter ¶ 50). Also, whereas Plaintiff was once a patrolman on the streets, he now works at the police station as a signal monitor, dispatching calls to the patrol cars and performing warrant checks. (56.1 Counter ¶ 49; Beccaris 48). Hoey sits at a desk which contains the keys to lockers which officers use to store their weapons. (Hoey 71-72, 111-12). Moreover, sergeants and lieutenants leave their weapons in unlocked drawers of Hoey's desk when they interview prisoners. (Hoey 71, 111-12). Thus, Hoey's access to weapons is not actually restricted, but he has not accessed the weapons to which he has had access. (Hoey 111-12).

## SUMMARY JUDGMENT STANDARD

Granting of a summary judgment motion is a drastic remedy to be used "sparingly." Gallo v. Prudential Residential Serv., 22 F.3d 1219 (2d Cir. 1994); Egelston v. State Univ. College, 535 F.2d 752 (2d Cir. 1976). It is drastic because it has res judicata effect and deprives the litigant of

his day in court and her opportunity to cross-examine the movant and movant's witnesses. Eastway Cons Corp. v. City of N.Y., 762 F.2d 243 (2d Cir. 1985), cert. denied, 484 U.S. 918 (1987); Egelston, 535 F.2d at 754. Because of the drastic nature of summary judgment, courts have circumscribed the remedy. The motion must be denied if any genuine issue of material fact exists. Celotex Corp. v. Catrett, 477 U.S. 317, 106 S. Ct. 2548 (1986).

The Second Circuit has cautioned against dismissing a discrimination claim on a summary judgment motion because the employer's intent is often at issue and is difficult to determine without carefully examining the surrounding facts. See Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997); Gallo, 22 F.3d at 1224. The court must carefully scrutinize the proofs submitted in the light most favorable to the non-movant and accord the non-movant the full benefits of all favorable inferences that may be drawn from the evidence. Waters v. Churchill, 511 U.S. 661, 114 S. Ct. 1878 (1994). Here, issues of fact exist so Defendants' motion cannot be granted nor can their defense be adequately proven on this motion.

## ARGUMENT

## I. DISABILITY DISCRIMINATION CLAIMS[4]

To state a disability discrimination claim, a plaintiff must show: "(i) the employer is covered by the statute and had notice of her disability; (ii) she was an individual who was disabled within the meaning of the statute; (iii) plaintiff was otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and (iv) she was subject to an adverse employment action as a result of her disability." McCowan v. HSBC Bank USA, N.A., 689 F. Supp. 2d 390, 398 (E.D.N.Y. 2010). Defendants dispute (A) that Plaintiff is disabled within the

[4] Plaintiff brings claims under the ADA and NYSHRL. The claims are analyzed largely the same. Levine v. Smithtown Cent. Sch. Dist., 565 F. Supp. 2d 407, 428 (E.D.N.Y. 2008). To the extent any differences exist, they will be noted.

meaning of the statute, (B) that he is otherwise qualified to perform his job, and (C) that he was subjected to an adverse action. The disputed elements are discussed below.

**A. Plaintiff's Bipolar Disorder is a Disability**

Disability should be construed in the favor of broad coverage. 42 U.S.C. § 12102(4)(A); C.F.R. § 1630.20(j)(1)(i) ("Substantially limits" is not meant to be a demanding standard."); 42 U.S.C. § 12102(4)(B). The main inquiry is whether there was discrimination, not whether the individual was disabled. See § 1630.2(j)(1)(iii). The "fact that the periods during which an episodic impairment is active and substantially limits a major life activity may be brief or occur infrequently is no longer relevant to determining whether the impairment substantially limits a major life activity." 29 C.F.R. § 1630.2(j)(1)(vii); Cyrus v. Papa's Dodge, Inc., 10 CV 21, 2012 WL 1057310, *3 (D. Conn. Mar. 28, 2012).

Under the ADA, a disability is, "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment."[5] White v. Sears Roebuck & Co., 07-CV-4286, 2009 WL 1140434, *6 (E.D.N.Y. Apr. 27, 2009) (quoting 42 U.S.C. § 12102(1)). Here, there is no question that bipolar disorder is an impairment under the ADA (Defendants' concede it is) and it is both an impairment and a disability under the NYSHRL. Elmowitz v. Executive Towers at Lido, LLC, 571 F. Supp 2d. 370, 376 (E.D.N.Y. 2008); Ex. 7 ("bipolar disorder qualifies as a disability under the Human Rights Law"). Although Plaintiff need only show he is disabled by one test, as discussed below, Plaintiff is disabled under each test.

[5] A disability under the NYSHRL is a condition that either (1) prevents the exercise of a normal bodily function or (2) is "demonstrable by medically accepted clinical or laboratory diagnostic techniques." Levine, 565 F. Supp. 2d at 428. As discussed below, although in remission due to treatment, Hoey has a condition which prevents the exercise of the normal body functions of thinking, sleeping, concentrating, and communicating. He also has a condition, bipolar disorder, which was clinically diagnosed. Accordingly, Hoey has a disability under the NYSHRL.

### 1. Plaintiff's Mental Impairment Substantially Limits Life Activities

To be considered a disability under the first test: "[1] plaintiff must first show that she suffers from a physical or mental impairment. [2] plaintiff must identify the activity claimed to be impaired and establish that it constitutes a 'major life activity.' [3] the plaintiff must show that her impairment 'substantially limits' the major life activity previously identified." McCowan, 690 F. Supp. 2d at 399 (quoting Weixel v. City of New York, 287 F.3d 138, 147 (2d Cir. 2002)). As already established, Plaintiff's bipolar disorder is a recognized and undisputed impairment. The last two elements are discussed below.

#### *i. Major Life Activity*

A major life activity includes, "eating, sleeping . . . learning, reading, concentrating, thinking, communicating, and working." Mary Jo. C. v. N.Y.S. and Local Retirement System, 707 F.3d 144, 165 (2d Cir. 2013) (quoting 42 U.S.C. § 12102(2)). Here, at South Oaks Hospital, Hoey was identified as having issues with sleeping and appetite and having "disorganized thinking." (Ex. 8). Thus, Hoey has established impairments to major life activities.

#### *ii. Substantial Limitation*

Hoey's impairments required a six day hospitalization, with treatment including physical and chemical restraints. Moreover, his thinking was impaired to the point that he was delusional and had trouble following the directions of hospital staff. (Hoey 23; Ex. 8; Blieka 22 (describing Hoey as having been "thought disordered")). These are substantial limitations. Moreover, the ADA amendments emphasize that an impairment may be in remission, yet nonetheless constitute a disability if it would substantially limit a major life activity when active. Cyrus, 2012 WL 1057310, at *3. Such is the case here, as Hoey's symptoms are controlled by medication and therapy, yet would substantially limit major life activities when active.

**2. Plaintiff Has a Record of Impairment**

Plaintiff has a record of a six day hospitalization for treatment of his impairment of bipolar disorder and of his subsequent out patient treatment. (Ex. 8; 9). Defendants were aware of the record and indeed, reviewed the record. (Blieka 21, 36). As discussed, the record indicates the impairment affected the major life activities of, *inter alia*, thinking and communicating, as evidenced by his testimony that he had trouble following directions. Accordingly, Hoey has established a disability under the "record of impairment" prong.

**3. Regarded As Having An Impairment**

Under the "regarded as having an impairment" test, a plaintiff must show "that he or she has been subjected to an action prohibited under [the ADA] because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." Alexiadis v. New York Coll. of Health Professions, 891 F. Supp. 2d 418, 428 (E.D.N.Y. 2012). In other words, the impairment need not actually limit a major life activity; rather, Defendants need only have acted on their belief, true or not, that Hoey had an impairment. Here, Beccaris, Meagher, and Krumpter kept Hoey on restricted assignment because they regarded him as having a mental illness impairment. (Ex. 6 ¶ 19; Beccaris 34 (the decision to keep Hoey on restricted assignment was based on the fact that "he suffered a mental break.")). Blieka made her recommendation based on her belief that Hoey had the impairment of bipolar disorder and "information regarding bipolar disorder and recurrences." (Blieka 19, 36). As discussed, bipolar disorder is an impairment and it cannot be disputed that Defendants believe Hoey suffers from such impairment and that made their decisions based on his having the impairment. Accordingly, Plaintiff has a disability under the "regarded as" test.

## II. PLAINTIFF WAS SUBJECTED TO AN ADVERSE EMPLOYMENT ACTION

An adverse action may be "a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." McCowan, 689 F. Supp. 2d at 390 (quoting Galabya v. New York City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000)); see also Kessler v. Westchester County Dep't of Soc. Servs., 461 F.3d 199, 209 (2d Cir. 2006) (triable issue of fact existed where plaintiff was transferred and maintained job title, yet did not perform functions set out in employer's official description of job title); Gentile v. Potter, 509 F. Supp. 2d 221, 241 (E.D.N.Y. 2007) ("denial of overtime is a materially adverse action"). Here, Hoey's designation to restricted duty is an adverse action because it significantly diminished his material responsibilities and caused a loss of benefits, to wit, overtime opportunities.

Before restricted duty assignment, Hoey was a police officer doing patrol with duties including: patrolling an assigned area, gathering information and evidence for investigations, locating and arresting wanted persons, directing traffic, engaging in high speed pursuits, rescuing individuals in emergencies, and maintaining an assigned vehicle and equipment. (Ex. 4). After being assigned to restricted duty, Hoey's duties were limited to dispatching calls to patrol cars and doing warrant checks. (Hoey 75). In other words, Hoey is not performing any of the most essential and basic duties of police officer and has been assigned responsibilities that are not within his job title. Accordingly, restricted assignment is an adverse employment action because the assignment has significantly and materially altered his job responsibilities.

Further, the assignment has significantly limited Hoey's potential for overtime. (Hoey 77-78). Restricted assignment does not *per se* prevent Hoey from earning overtime, but most of the overtime available for police officers is created when the NCPD must "fill" a car. (Hoey 78).

Because Hoey is prohibited from working in a patrol car, he does not have the same access to overtime opportunities as do full duty officers. (Hoey 78). Indeed, in 2012, Hoey witnessed officers earn record amounts of overtime because of Superstorm Sandy. (Hoey 79-80). Some officers earned two years of overtime whereas Hoey earned $1,130 in overtime. (Hoey 80-81 (testifying further that if he were full duty, the amount would have been higher)).

Defendants rely on Santiago v. New York City Police Dep't, 05CIV3035, 2007 WL 4382752 (S.D.N.Y. Dec. 14, 2007) aff'd, 329 Fed. Appx. 328 (2d Cir. 2009) for the proposition that Hoey cannot show an adverse action. In Santiago, a suicidal police officer involved in a domestic dispute was placed on restricted duty without weapons. The Santiago plaintiff testified "I continued to do the same duties. I went to work, picking up stuff, delivering stuff. I still got overtime compensation. I drove a marked vehicle. Everything I was doing before. The only thing that changed, I didn't have a weapon." Id. *20 (emphasis added). The court dismissed the ADA claim, holding, in part, that no adverse employment action occurred because the "[t]emporary removal of his weapon did not result in the loss of his job, or loss of pay or any benefits." Id. *8. In other words, he conceded that his responsibilities were exactly the same as before the restriction, but he was doing them without a weapon. In contrast, Hoey's responsibilities are significantly and materially changed, accompanied by a change in benefits.

Defendants also rely on Pierre v. Napolitano, 11 CIV. 4935, 2013 WL 3835428 (S.D.N.Y. July 24, 2013), a case involving an Immigration and Customs Enforcement agent who was assigned to light duty, but whose pay was unaffected. Like Santiago, Pierre conceded that his assignments, although undesirable, were assignments that all ICE officers were required to perform periodically. Here, Hoey has shown that he is assigned responsibilities that are not within police officers' job responsibilities. Accordingly, Plaintiff has established an adverse action.

## III. PLAINTIFF IS QUALIFIED AND NO LEGITIMATE REASON EXISTS FOR HIM TO REMAIN ON RESTRICTED ASSIGNMENT

Defendants argue that Plaintiff is not qualified under the "direct threat" exception and that their decision to keep Hoey on restricted assignment is legitimate because of safety concerns. Both positions are flawed.

### A. Defendants Have Not Met Their Burden of Establishing Hoey is a Direct Threat

Direct threat means "a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation." Sista v. CDC Ixis North America, Inc., 445 F.3d 161, 170 (2d Cir. 2006) (citing 42 U.S.C. § 12111(3)). The employer bears the burden of establishing a direct threat defense. Hargrave v. Vermont, 340 F.3d 27, 35 (2d Cir. 2003).[6] Thus, summary judgment cannot be granted unless the evidence is conclusive. Ebbert v County of Nassau, No. 05-CV-5445, 2009 WL 935812, *5 (E.D.N.Y. Mar. 31, 2009).

> The "poses a direct threat defense" requires an "individualized assessment of the employee's present ability to safely perform the essential functions of the job . . . based on a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence."[7] 29 C.F.R. § 1630.2(r). When conducting such an "individualized assessment," the factors to be considered include "(1) [t]he duration of the risk; (2)[t]he nature and severity of the potential harm; (3)[t]he likelihood that the potential harm will occur; and (4)[t]he imminence of the potential harm."[8]

Sista, 445 F.3d at 170.

---

[6] Circuits are split as to whether direct threat is a defense or part of a showing a plaintiff must make to show he is qualified. Defendants rely on a First Circuit case to take advantage of this split and confuse the issue. They argue Hoey is not qualified because he is a threat and that he bears the burden of proving he is qualified. (Def. Mem. at 13-14). However, in the Second Circuit, defendants bear the burden of proving their direct threat defense. Hargrave, 340 F.3d at 35.

[7] The April 2010 denial was made by laypersons without any reliance on medical knowledge whatsoever. At a minimum, the direct threat defense is not available to this denial.

[8] Direct threat is analyzed largely the same under the NYSHRL. See 9 N.Y.C.R.R. § 466.11(g)(2).

Notably, "[g]eneralized fears about risks from the employment environment, such as exacerbation of the disability caused by stress, cannot be used by an employer to disqualify an individual with a disability." Nelson v. City of New York, 2013 WL 4437224, *9 (S.D.N.Y. Aug. 19, 2013). To establish a direct threat defense, defendants must do more than speculate about possible safety concerns; they must produce evidence that the plaintiff's condition causes a genuine safety concern. Simms v. City of New York, 160 F. Supp. 2d 398, 405-6 (E.D.N.Y. 2001); see also Lovejoy-Wilson v. NOCO Motor Fuel, Inc., 263 F.3d 208, 220 (2d. Cir 2001) (defendant failed to provide any evidence of significant risk of substantial harm where plaintiff's seizures lasted less than a few minutes, only injury sustained during employment was a minor one to elbow, and before litigation, employer never had concern about her being a risk); Jackson v. City of New York, CV 06-1835, 2011 WL 1533471, *16 (E.D.N.Y. 2011) (plaintiff's doctor indicated plaintiff was able to return to work and defendant did not identify "any incidents where plaintiff was injured or caused harm to others while on-duty as a result of her affliction"); Compare Brennan v. New York City Police Dep't, 141 F.3d 1151 *3 (2d Cir. 1998) (defense appropriate where plaintiff "removed his gun, placed it into a gym bag, carried the bag onto the subway, fell asleep during the subway ride, and either allowed the bag to be stolen while he slept or left it behind when he exited the subway"); Krasner v. City of New York, 2013 WL 5338558, *12 (S.D.N.Y. Sept. 23, 2013) (applying defense where it was "undisputed that [plaintiff] repeatedly engaged in serious misconduct, including threatening co-workers with serious harm").

Nelson is instructive. As Defendants note, the Court in Nelson determined that the direct threat defense was a close question and allowed the claim to proceed to trial, emphasizing that defendants must prove the defense "beyond genuine dispute." Nelson, 2013 WL 4437224, at *9. In Nelson, the plaintiff was diagnosed with "passive suicidal ideation." Id. at *1. Thus, there was an

actual threat of self harm. Moreover, at least one doctor opined that Plaintiff "no longer suffered from debilitating mental illness" and was able to work as a police officer. Id. at 12.

Here, Plaintiff has not been diagnosed with suicidal ideation, has not indicated he is suicidal, and Blieka acknowledges Hoey has not tried to hurt himself.[9] (Blieka 50). Further, Plaintiff has not displayed any threats of harm to anyone else, unlike the plaintiffs in Brennan and Kasner. Although Blieka believes Hoey tried to hurt someone else based on a report that Hoey was aggressive to staff at the hospital,[10] Defendants offer no specific evidence that Hoey tried to cause harm to someone and Blieka is not aware of any other episodes of aggression. (Blieka 24, 50). Dr. Greenberg described Hoey's demeanor as "agitated" at NUMC and Hoey described himself as being slow to react to direction, so issues of fact exist as to whether Hoey was violent, either at all, or to a degree to justify Defendants' actions. (Hoey 23).

Further, at the onset of his psychiatric emergency in 2009, Hoey voluntarily had his wife drive him to the hospital. (56.1 Counterstatement ¶ 2). He had access to his weapon at the time of the emergency, but did not use it or attempt to access it. (Id.). As discussed further below, Hoey continues to have access to guns at work, but has not used any or attempted to use any. (Hoey 71, 111-12). Moreover, like Nelson, at least two doctors, one of which was a NCPD doctor, both concluded that Hoey was fit for full duty. Thus, there is at least an issue of fact as to the direct threat defense.

Defendants attempt to distinguish Nelson by arguing that the Court found it important that the City's doctor did not address "plaintiff's current psychological profile," and they claim Blieka did so. (Def. Mem. at 12 n.4). However, in Nelson, the Court noted that the City's doctor relied

[9] Defendants concede Hoey is not suicidal. (Def. Mem. at 14).

[10] Blieka finds it important that Hoey was given intramuscular medication at the hospital, yet the South Oaks discharge papers indicate the use of such medications was not necessary. (Ex. 10).

predominantly on plaintiff's history but did not rely on the more recent findings of plaintiff's treating psychiatrist. Nelson, 2013 WL 4437224, at *9. Blieka did not address Hoey's current psychological profile either. Indeed, like the City doctor in Nelson, Blieka relied heavily on Hoey's psychiatric history but did not review Hoey's treating psychiatrist's notes from treatment after the hospitalization and did not talk to his treating psychiatrist. (Blieka 19, 36). Notwithstanding, Blieka found Hoey clinically stable, but yet did not return him to full duty. (Ex. 9).

In sum, Hoey suffered one psychiatric emergency in 2009 which did not involve an attempt to hurt himself or another. He voluntarily admitted himself to the hospital and he has been compliant with continued therapy, medication, and regular visits with his psychiatrist and therapist. In the four years since his hospitalization, he has not suffered any further acute symptoms and he is described as stable, even by Blieka. Further, he has been counseled in recognizing the recurrence of a mood disorder and in coping skills. (Greenberg 42). Other than proffering some speculative risk of recurrence,[11] Defendants have not met their burden of establishing Hoey is a direct threat, so the defense should be rejected.

**B. Defendants' Business Reason is Pretext**

Defendants appear to argue that their purported safety concerns also constitute a legitimate business reason and demonstrate a lack of discriminatory animus. To the extent such an argument is offered and to the extent it is something to be considered apart from the direct threat defense, the reason is pretextual, as discussed below.

---

[11] Blieka claims to know Hoey's risk of recurrence in terms of a specific percentage. (Blieka 29). Dr. Greenberg, however, testified that there is no way to make such a determination with modern medicine. (Greenberg 76). But, even if his risk of recurrence were able to be scientifically quantified and even if that risk were high, Defendants still offer no evidence why the risk of recurrence is equivalent to or correlates to a risk of Hoey being a direct threat. Even if he were to relapse, it is mere speculation that the relapse would cause him to use his weapon to hurt himself or others.

Preliminarily, by acknowledging that they made business decisions based on Plaintiff's disability (or their perception of his disability), they concede that they violated the statute. The ADA prohibits taking adverse employment actions against employees because of the employee's disability. Plaintiff is not required to show that Defendants harbor some generalized animosity to people at large who are diagnosed with bipolar disorder, he need only show that action was taken against him based on his disability. McCowan, 689 F. Supp. 2d at 398; see also Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 121 (1985) ("McDonnell Douglas[12] [burden shifting] test is inapplicable where the plaintiff presents direct evidence of discrimination"). This case is not one where Defendants terminated an employee and claim it was because of poor performance and not because of the employee's disability. Defendants admit the reason is based on Plaintiff's bipolar disorder so Plaintiff does not have to prove pretext. (Def. Mem. at 14).

If Defendants' safety concern is considered a legitimate business reason and the Court applies McDonnell-Douglas's burden shifting framework, the business reason is pretext. Defendants reference another lawsuit in which Judge Spatt thought it prudent for Defendants to implement a suicide risk assessment program. (Def. Mem. at 14) (citing Robischung-Walsh v. Nassau County Police Dep't,[13] 699 F. Supp. 2d 563 (E.D.N.Y. 2010)). To the extent Defendants argue their actions against Hoey are part of such a risk assessment program, they put forth no

---

[12] Although Plaintiff is confident the Court understands the reference to McDonnell-Douglas, for completeness sake, the test sets forth an evidentiary standard used to analyze discrimination claims where there is no direct evidence of discrimination: Plaintiff sets forth a prima facie case of discrimination, after which the defendant can put forth a legitimate business reason for the action; the burden then shifts back to plaintiff to show pretext. Howley v. Town of Stratford, 217 F.3d 141, 150 (2d Cir. 2003).

[13] Defendants allude to Robischung-Walsh and to other incidents involving police officers' suicides. Blieka is not aware of any link between any of those suicides and the officers' mental health, but she believes generally that suicides are related to mental health illness, further supporting the fact that her decisions are based on stereotypes and not individual determinations. (Blieka 156; 162).

evidence supporting such claim. Notwithstanding, Hoey is clearly not part of such a program. Defendants evaluate him only when he has asked for a change in status. Further, since the last time he asked, nearly three years ago, Defendants have shown no interest in re-evaluating him – either to return him to full duty, or to reassess his risk. (Blieka 45). Accordingly, Defendants' treatment of Hoey is not part of a legitimate risk assessment program.

Moreover, Defendants' alleged concern about safety is further belied by the fact that they assigned Hoey to a position where he is entrusted with safeguarding other officers' weapons. Hoey sits at a desk which contains the keys to lockers used by officers to store their weapons when they process arrestees. (Hoey 71, 111-12). Additionally, supervisors such as lieutenants and sergeants store their weapons in an unlocked drawer in Hoey's desk when they question prisoners. (Hoey 71-72, 111-12). Thus, no reasonable juror could believe Defendants are truly concerned about Hoey's safety risk. Moreover, that Hoey has had access to these weapons for nearly four years and has not even attempted to access them, nevertheless use them (Hoey 111-12), shows Hoey is not a real risk.

Further, Blieka's actions related to other officers also shows she is not concerned about risk, but rather she is acting on her stereotyped beliefs about bipolar patients. Blieka has evaluated no less than six officers with violent propensities who were allegedly involved in real acts of violence, including driving away with a person's arm in a car door, taking a gun out of a holster at an inappropriate time, threatening to put a gun to an ex-wife's head, and an officer charged with multiple incidents of domestic violence. (Ex. 11-16). Those officers' weapons were returned, albeit sometimes with restrictions that the weapon not be taken home. (Ex. 11-16).

In one case, an officer with alcoholism called his partner while drunk and made suicidal statements. (Ex. 16). When Blieka met with the officer, he did not have active symptoms of alcohol abuse. Although Blieka acknowledged that there is a possibility that he could relapse and

resume drinking, and although the officer had a history of expressing suicidal ideation while drunk, Blieka recommended this officer be returned his guns. (Blieka 137-140; Ex. 16). In contrast she did not recommend Hoey be returned his guns, even though Hoey was not suicidal and was not violent. Even if his alleged "aggression" is considered violence, it is far less serious than the actions of these comparator officers. Accordingly, Defendants are not truly concerned about their officers harming themselves or others.

## IV. BLIEKA IS A PROPER DEFENDANT[14]

The Second Circuit has made clear that an individual who "actually participates in the conduct giving rise to a discrimination claim may be held personally liable under the HRL." Tomka v. Seiler Corp., 66 F.3d 1295, 1317 (2d Cir. 1995); Nelson, 2013 WL 4437224, at *14-15 (police department's doctors who recommended plaintiff should not be reinstated due to psychological reasons are appropriate defendants under the NYSHRL); see also Silverstein v. Lawrence Union Free Sch. Dist., CV 10-993, 2011 WL 1261122, *10 (E.D.N.Y. Feb. 15, 2011) (refusing to dismiss from action Superintendant who made an employment recommendation to the Board of Education which made final decision).

Here, Blieka's conduct is similar to that in Nelson. Blieka recommended that Hoey remain on restricted assignment. Beccarris testified that the doctors' recommendations are usually followed and, at a minimum, they are heavily relied on. Further, Blieka participated in a discussion with Krumpter, Meagher, and Beccaris, following Klugman's April 2010 evaluation wherein "[a]ll individuals at this meeting expressed deep concern about returning Plaintiff to full duty" then the decision was made to not return him. (Ex. 6 ¶ 19). Thus, Blieka participated in decisions that kept Hoey on restricted assignment no less than two times, expressed her view that he should be kept on

[14] To the extent the Complaint alleges a cause of action against Blieka personally under the ADA, Plaintiff withdraws such claim as no such claim was intended to be asserted.

restricted assignment, and Hoey was indeed kept on restricted assignment. Accordingly, Blieka actually participated in the conduct giving rise to the discrimination.

## V. QUALIFIED IMMUNITY IS NOT AVAILABLE

To determine whether to apply qualified immunity, Court first determine if a statutory violation exists. Fierro v. City of N.Y., 2009 WL 2223067, at *1 (2d Cir. July 27, 2009) (citation omitted). If there is, "then the Court must determine if that right was clearly established at the time the challenged decision was made, and whether the Defendants' actions were objectively unreasonable." Id. (citation omitted). Officials are protected by qualified immunity "so long as their conduct does not violate a clearly established statutory or constitutional right." Richardson v. Selsky, 5 F.3d 616, 621 (2d Cir. 1993) (citing Harlow v. Fitzgerald, 457 U.S. 800, 818-19 (1982)).

To determine if the acts of the Defendants violated the Plaintiff's constitutional or statutory rights, the court must evaluate "(1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under pre-existing law a reasonable defendant official would have understood that his or her acts were unlawful." Schecter v. City of New York, 79 F.3d 265, 271 (2d Cir. 1996) (citations and internal quotations omitted).

Here, the law is clearly established that employees have an established right to be free from discrimination on the basis of a disability. Coleman v. Town of Old Saybrook, 03CV01275, 2004 WL 936174, *4 (D. Conn. Apr. 28, 2004) ("the right not to be subjected to disability discrimination has long been clearly established"); See also Scotti v. County of Nassau, CV02-3685, 2005 WL 3670913, *8 (E.D.N.Y. Sept. 13, 2005). As discussed above, Blieka violated Plaintiff's clearly established statutory rights by recommending that Hoey remain on restricted duty based on her stereotypes about his risk of relapse and risk of violence. Moreover, her recommendation is

opposite to that of two other psychiatrists, including another NCPD psychiatrist, thus, issues of fact exist as to whether Blieka was motivated based on her stereotypes and animus to police officers diagnosed with bipolar or whether her decision was made in good faith based on medical evidence. Accordingly, qualified immunity is not an available defense.

## V. THE COURT SHOULD EXERCISE SUPPLEMENTAL JURISDICTION OVER PLAINTIFF'S STATE LAW CLAIMS

Since dismissal of the federal claim is not appropriate, the Court should retain jurisdiction over Plaintiff's state law causes of action since they arise from the same "nucleus of operative facts." Solomon v. Nassau County, 759 F. Supp. 2d 251, 263-64 (E.D.N.Y. 2011).

## CONCLUSION

For the reasons discussed herein, Defendants' motion should be denied in its entirety.

Dated: Carle Place, New York
November 8, 2013

Respectfully submitted,

LEEDS BROWN LAW, P.C.
*Attorneys for Plaintiff*
One Old Country Road, Suite 347
Carle Place, N.Y. 11514
(516) 873-9550
By:_____________/s/______________
MATTHEW WEINICK