UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------X
CHRISTOPHER HOEY,

               Plaintiff,

-against-

COUNTY OF NASSAU,


               Defendant.
---------------------------------------------------------X

**MEMORANDUM OF DECISION
AND ORDER**
CV 12-4935 (GRB)

**GARY R. BROWN, United States Magistrate Judge:**

      In this action, police officer Christopher Hoey seeks damages against the County of Nassau (the "County") and former defendant Dr. Marjorie Blieka, based upon purported discrimination under the Americans with Disabilities Act ("ADA") and the New York State Human Rights Law ("NYSHRL") for their refusal to return him to unrestricted duty following an episode related to bipolar disorder.  Following a trial during which a jury returned a verdict in favor of plaintiff and found compensatory and emotional damages totaling $129,500, the parties have filed two motions which are presently before the Court.  First, the County seeks relief from the judgment or a new trial pursuant to Rules 50 and 59 of the Federal Rules of Civil Procedure, and Hoey seeks an injunction ordering his return to full duty work based upon the jury's verdict.

      After review of the parties' motion papers, the undersigned identified an issue, not briefed by counsel, concerning the relationship between the interrogatories posed to the jury (along with the concomitant instructions) and existing law concerning ADA claims in the fact-specific context of this matter.  In sum, the jury here was asked to determine whether the defendant proved that plaintiff's condition constitutes a "direct threat" to the safety of himself and/or others.  However, it appears that the jury should have been asked to determine whether

the defendant had made an objectively reasonable determination on the question of direct threat,
rather than whether plaintiff constituted a direct threat.  That issue was outlined in an order dated
January 4, 2017, which directed that counsel brief this question.  The Court has reviewed the
corresponding submissions of the parties and heard oral argument.  This opinion follows.

Because the law requires a new trial as to this question, I hereby grant, in part, the
County's motion pursuant to Rule 59.  The County's motion for a directed verdict under Rule 50
is denied and the plaintiff's motion for injunctive relief is denied as premature.

**PROCEDURAL HISTORY**

This action was commenced by the filing of a complaint on September 28, 2012. In that
action, plaintiff Christopher Hoey, a police officer with the Nassau County Police Department
("NCPD") seeks damages and injunctive relief based upon allegations that he has been
improperly assigned to a desk job and prohibited from working as a patrol officer based upon his
psychiatric disability, described further herein.  Plaintiff sought relief against the County for
discrimination and alleged adverse employment actions under the ADA and the NYSHRL
Section 296, and against Dr. Blieka for allegedly aiding and abetting such unlawful conduct in
violation of NYSHRL Section 296(6).  *See generally* Complaint, DE 1.  On or about November
15, 2012, the parties consented to exercise of jurisdiction before Magistrate Judge Thomas
Boyle, and the matter was subsequently transferred to the undersigned.  DE 6, 7.

Defendants moved for summary judgment as to all claims.  That motion was granted
insofar as it applied to the ADA claims regarding defendant Blieka, but was otherwise denied in
a Memorandum of Decision and Order ("Summary Judgment Order"), familiarity with which is
assumed.  *Hoey v. County of Nassau*, No. 12-cv-4935 (GRB), 2014 WL 4656223 (E.D.N.Y.
Sept. 12, 2014).

Trial commenced on May 10, 2016.  On May 13, 2016, following the close of plaintiff's case, counsel for defendants moved for dismissal as a matter of law as to Dr. Blieka on the sole cause of action pending against her.  *See* Transcript ("Tr."), DE 65.  At that point, the Court made the following determination:

> I find that the plaintiff has provided no competent evidence concerning the May, 25, 2010 meeting other than Dr. Blieka's testimony, which does not suggest that anything untoward happened. To the contrary, specific evidence has been submitted clarifying why police officials had a good-faith basis for questioning the determinations made by Dr. Klugman at that time. This evidence includes, one, the testimony of Dr. Klugman himself, who acknowledged the temporal limitations of his opinions, which would, inexplicably, only be valid for as long as the officer remained healthy. Secondly, there is the evidence of collateral events involving serious indeed and sadly fatal occurrences with regard to two other officers that Klugman had cleared for full duty with firearms at or around that time. This evidence, along with questions about Dr. Klugman's methodology, suggests that law enforcement officials had a legitimate reason to question his determinations.[1]

> Secondly, with respect to the June 2011 evaluation of the plaintiff by Dr. Blieka, plaintiff has not introduced evidence to raise any serious question concerning whether Dr. Blieka's evaluation was made in good faith. In particular, I note the testimony of Dr. Greenberg, plaintiff's treating psychiatrist, who testified that while he differed with her conclusions, he could not question her methodology or suggest that her approach to this matter was in any way unprofessional.

> Having had the opportunity to observe Dr. Blieka testify for a full trial day and having reviewed her work carefully, I have reached the firm conclusion that she carried out her responsibilities professionally and conscientiously. Further buttressing this determination is the evidence that she recommended restoring one or more other officers suffering from bipolar disorder to full duty status including firearm use.  In this Court's considered opinion, this fact undermines the claim that she bore any discriminatory animus toward Officer Hoey on the basis of his diagnosed disability.

---

[1] As noted previously, Judge Spatt had contemporaneous questions about the efficacy of related practices.  *Robischung-Walsh v. Nassau Cnty. Police Dep't.*, 699 F. Supp. 2d 563, 567 (E.D.N.Y. 2010) ("[I]t may be prudent for the NCPD to implement a more comprehensive suicide risk assessment and prevention program.").

> Therefore, based on all of these factors, I find that defendant Blieka's motion for a directed verdict should be granted. Furthermore, to the extent that qualified immunity applies, and I don't know if it applies for certain, though the Lore case suggests that it might, I find that there's no remaining question of . . . bad faith on the part of Dr. Blieka, so she would be shielded by qualified immunity to the extent it applies. Therefore, the count against her is dismissed.

DE 65 at 15-17.  That determination has not been challenged on these motions.  Defense counsel

also moved for judgment as a matter of law in favor of the County, which was denied.  DE 65 at

3.

At trial, the verdict sheet provided to the jury posed the following three questions:

1. Did plaintiff prove by a preponderance of the credible evidence that he was qualified to serve as a full duty police officer?

2. Did plaintiff prove by a preponderance of the credible evidence that he suffered an adverse employment action by being assigned to restricted duty as a police officer?

3. Did defendant prove by a preponderance of the credible evidence that plaintiff would pose a direct threat to the health and safety of himself or others if assigned as a full duty police officer?

DE 56.

On May 18, 2016, the jury returned a verdict.  The jury answered the first two questions

in the affirmative, and the third in the negative.  In other words, the jury found that plaintiff

established that he was qualified to serve as a full-duty police officer and suffered an adverse

employment action by being assigned to restricted duty, and that defendant failed to establish

that plaintiff presented a direct threat to the health and safety of himself or others if assigned as a

full duty police officer.  The jury further found that plaintiff suffered $80,000 in economic

damages and $49,500 in emotional harm, pain and suffering.

After the trial, both parties were offered the opportunity to present additional evidence

regarding the injunctive relief sought by plaintiff.  DE 64 at 8-13.  Neither party opted to submit

4

any other factual material, relying instead on the trial record.  *Id.*

**FACTS**

At trial, numerous witnesses testified, including the plaintiff, his wife, the police commissioner and a bevy of medical experts.  In the main, the testimony offered did not alter the above factual summary in significant fashion.  However, regarding defendant's mental state and his ability to return to full-duty police work, the jury was presented with testimony and records from more than a half-dozen psychiatrists, psychologists and therapists.  Most of this information derived from examinations that occurred years ago, and the opinions offered by these medical professionals proved varied and, at times, diametrically opposed.  *See, e.g.*, Tr. at 427 (Dr. Honor finding "Hoey can be returned to full duty with weapons"), *id.* at 656-57 (Blieka opining that Hoey should not be returned to full duty and that Honor's opinion was "ridiculous"); *id.* at 918 (Dr. David opining that Hoey was not fit to return for full duty).  Perhaps predictably, with one notable exception, these opinions varied consistent with the side offering the evidence, *i.e.* plaintiff's experts and treating practitioners opined that he was fit to return to full duty, while defendant's experts believed he was unfit for such a return.  Indeed, Dr. Greenberg, plaintiff's treating psychiatrist, rendered such an opinion a mere ten days after his psychotic episode.  *See id.* at 53-54, Ex. 4 (Dr. Greenberg opining on December 2, 2009 that "he may return to full-duty without restrictions").

The exception, as discussed in the Summary Judgment Order, was the April 2010 report of Dr. Klugman, in his role as an NCPD police surgeon, which suggested that "there is no psychiatric contraindication to PO's returning to full duty status with weapons."  DE 27-5, Ex. N at 2; DE 38 at 10.  Yet, at trial, Dr. Klugman's testimony proved problematic.  He testified that in issuing this report, "my function was to evaluate the officer and describe his state of mental

health at that specific time, and if he had to go back to work on that day, he was well enough to do so." Tr. at 341. Upon questioning by the Court, Dr. Klugman advised that his opinion had no prognostic value but was "good for as long as he stays healthy." *Id.* at 376. Dr. Klugman further testified that had he understood his function to be broader than evaluating plaintiff's fitness to immediately return to duty, he would have reached a different conclusion. *Id.* at 342-43. Astoundingly, in recommending to the police commissioner that Hoey should be returned to full duty, Dr. Klugman made no effort to factor in his "continued well being" or to "predict Officer Hoey's future." *Id.* at 343; *cf.id.* at 375 ("I'm making no prediction about the future."). This was true notwithstanding Dr. Klugman's awareness that the risk of episodic recurrence in the face of a diagnosis of Bipolar Disorder Type I was from 60% to 90%. *Id.* at 357.

This testimony was supplemented by additional proof concerning Dr. Klugman's opinions relating to several other officers. This included one officer with a history of depression whom Dr. Klugman "cleared" for full duty in December 2009, but committed suicide four months later. *Id.* at 586-87. Another case involved an officer who, like plaintiff, suffered from Bipolar Disorder Type I whom Dr. Klugman cleared for duty in January 2009, and was involved in a fatal shooting in December 2009. *Id.* at 597. While that shooting was later determined to be justified, questions surrounding that shooting and Dr. Klugman's assessment lingered and were considered as part of the Commissioner's decision to seek a second opinion following Dr. Klugman's April 2010 determination regarding plaintiff. *Id.* at 1061.

**DISCUSSION**

**Standard for Granting a New Trial under Federal Rule of Civil Procedure 59**

As this Court has previously noted:

Under Rule 59, a trial court "may, on motion, grant a new trial on all or some of

6

the issues ... after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court."  [ ] The standard for evaluating such a motion "differs in two significant ways from the standards governing a Rule 50 motion for judgment as a matter of law. Unlike judgment as a matter of law, a new trial may be granted even if there is substantial evidence supporting the jury's verdict. Moreover, a trial judge is free to weigh the evidence himself, and need not view it in the light most favorable to the verdict winner."

*Anderson v. Aparicio*, 25 F. Supp. 3d 303, 309 (E.D.N.Y. 2014) (quoting *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 134 (2d Cir. 1998)).

Notably, a more specific standard applies to the granting of a new trial based upon an erroneous jury charge.  "An erroneous instruction, unless harmless, requires a new trial." *Anderson v. Branen*, 17 F.3d 552, 556 (2d Cir. 1994); *cf. United States v. Bah*, 574 F.3d 106, 114 (2d Cir. 2009). "An error is harmless only if the court is convinced that the error did not influence the jury's verdict." *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 116 (2d Cir. 2000). "Where jury instructions create an erroneous impression regarding the standard of liability, it is not harmless error because it goes directly to the plaintiff's claim, and a new trial is warranted." *LNC Inv., Inc. v. First Fidelity Bank, N.A. New Jersey*, 173 F.3d 454, 463 (2d Cir. 1999); *Anderson*, 17 F.3d at 556 ("A jury instruction is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law.").

This also raises the question of preservation of an objection to such an error. Notwithstanding the Court's request that counsel carefully consider the verdict sheet and the charge, no request was made to modify these questions, add additional interrogatories or to have the jury otherwise consider the issues discussed herein.[2]  Tr. at 119-120 (Court requesting that

---

[2] Defendant's request to charge did propose the following language:

In deciding whether an employer reasonably relied on the particular facts then before it, the law does not require that the decision process used by the employer

counsel pay particular attention to verdict sheet questions); *id.* at 814 (same); *id.* at 1189-1203 (no relevant objection raised).  Moreover, the issue has not been squarely raised on this motion.

Rule 51(d)(1) only permits a party to move regarding an erroneous instruction given to the jury "if that party properly objected," and similarly limits motions regarding the failure to give a particular instruction "if that party properly requested it and—unless the court rejected the request in a definitive ruling on the record—also properly objected."  Fed. R. Civ. P. 51(d)(1)(A) & (B).  However, Rule 51 also provides an exception to this general principle, directing that "[a] court may consider a plain error in the instructions that has not been preserved as required by Rule 51(d)(1) if the error affects substantial rights."  Fed. R. Civ. P. 51(d)(2).  Thus, even if not properly preserved, an omission in a jury instruction "that deprive[s] the jury of adequate legal guidance to reach a rational decision on a case's fundamental issue constitutes plain error" and is subject to review.  *Rasanen v. Doe*, 723 F.3d 325, 334–35 (2d Cir. 2013).  These principles equally apply to "an alleged error in the . . . verdict sheet."  *Jarvis v. Ford Motor Co.*, 283 F.3d 33, 56 (2d Cir. 2002).

**Analysis**

The ADA "prohibits 'discriminat[ion] against a qualified individual with a disability because of the disability . . . in regard to' a number of actions by an employer."  *Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 78 (2002); 42 U.S.C. § 12112(a).  Critically, here, however:

> the Act creates an affirmative defense for action under a qualification standard "shown to be job-related for the position in question and ... consistent with

---

> be optimal, or that it left no stone unturned. Rather, the question is whether the employer made a reasonably informed and considered decision before taking an adverse employment action.

DE 48 at 2, ¶ 9.

> business necessity." Such a standard may include "a requirement that an individual shall not pose a direct threat to the health or safety of other individuals in the workplace," § 12113(b), if the individual cannot perform the job safely with reasonable accommodation, § 12113(a).

*Id.*

Generally, "[c]laims alleging disability discrimination in violation of the ADA are subject to the burden-shifting analysis originally established by the Supreme Court in *McDonnell Douglas*." *McMillan v. City of New York*, 711 F.3d 120, 125 (2d Cir. 2013). However, as the Second Circuit observed:

> While the burden-shifting *McDonnell Douglas* analysis is useful in most discrimination cases, it is not helpful here. When the reason given by the employer for the adverse employment action is unrelated to the employee's disability, the *McDonnell Douglas* approach can be used to weed out non-viable claims of discrimination based on circumstantial evidence. When the parties agree that the employer complains of conduct that is the direct result of the employee's disability, however, there is no need to evaluate whether the employer's adverse employment action made in response to that conduct is pretextual.

*Id.* at 129.[3]

Thus, the principal (if not exclusive) defense relied upon by the County is the "direct threat" exception, which permits adverse employment actions based upon a reasoned determination that the plaintiff posed a direct threat to himself or others if permitted to return to full-duty work. The ADA, like the Rehabilitation Act that preceded it, "excepts from the definition of a protected 'qualified individual with a handicap' anyone who would pose a 'direct threat to the health or safety of other individuals,'" *Chevron U.S.A. Inc.*, 536 U.S. at 81(quoting 42 U.S.C. § 12113(b)). Specifically, the ADA provides:

> It may be a defense to a charge of discrimination under this chapter that an

---

[3] As a result, the County's arguments that the Police Commissioner's decisions were not pretextual are entirely inapposite. *See, e.g.*, DE 71-1 at p. 14.

> alleged application of qualification standards, tests, or selection criteria that
> screen out or tend to screen out or otherwise deny a job or benefit to an individual
> with a disability has been shown to be job-related and consistent with business
> necessity, and such performance cannot be accomplished by reasonable
> accommodation.

§ 12113(a).

In connection with the County's defense under this section, counsel for plaintiff

repeatedly cited the *Lovejoy* decision, in which the Second Circuit held:

> To protect disabled individuals from discrimination based on prejudice,
> stereotypes, or unfounded fear, an individualized assessment of the [employee's]
> present ability to safely perform the essential functions of the job based on
> medical or other objective evidence is required.  To determine whether an
> individual poses a direct threat, we must consider factors including: (1) the
> duration of the risk; (2) the nature and severity of the potential harm; (3) the
> likelihood that potential harm will occur; and (4) the imminence of potential
> harm.

*Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 220 (2d Cir. 2001) (alterations

omitted); *Hargrave v. Vermont*, 340 F.3d 27, 35–36 (2d Cir. 2003) (same).  This oft-quoted

passage might suggest that the finder of fact should reconsider *de novo* a determination by an

employer that an individual posed a direct threat.

However, a significant body of case law appears to suggest that the correct inquiry is not

whether the employee does, in fact, present a direct threat, but rather whether the employer made

an objectively reasonable determination based upon an appropriate, individualized medical

assessment on this issue.  As the Supreme Court held in a case decided a year after *Lovejoy*:

> The direct threat defense must be "based on a reasonable medical judgment that
> relies on the most current medical knowledge and/or the best available objective
> evidence," and upon an expressly "individualized assessment of the individual's
> present ability to safely perform the essential functions of the job," reached after
> considering, among other things, the imminence of the risk and the severity of the
> harm portended. 29 CFR § 1630.2(r) (2001). The EEOC was certainly acting
> within the reasonable zone when it saw a difference between rejecting workplace
> paternalism and ignoring specific and documented risks to the employee himself,

10

even if the employee would take his chances for the sake of getting a job.

*Chevron U.S.A. Inc.*, 536 U.S. at 86.  Other decisions have followed suit.  As one court has held:

> In evaluating a defense of direct threat, the factfinder's responsibility is not to independently assess whether a plaintiff *actually* posed a direct threat to himself or others, but to determine whether the defendant's determination that plaintiff was a direct threat was a reasonable medical judgment based upon: (1) an individualized assessment and (2)(a) current medical knowledge, and/or (b) the best available objective evidence. *See Doe v. Deer Mountain Day Camp, Inc.*, 682 F.Supp.2d 324, 346 (S.D.N.Y. 2010). The focal point, in other words, is the *ex ante* reasonableness of a defendant's determination, not an *ex post* determination of its accuracy by the factfinder. *See Brennan*, 1997 WL 811543, at *6 (granting summary judgment on direct threat claim because "[t]o the extent that the defendants considered plaintiff's alcoholism or potential relapse in their termination decision, they did so reasonably"). An erroneous diagnosis, or one based on what is later learned to be an erroneous view of the facts, is not necessarily an unreasonable one.

*Makinen v. City of New York*, 53 F. Supp. 3d 676, 697–98 (S.D.N.Y. 2014); *Jarvis v. Potter*, 500 F.3d 1113, 1121–23 (10th Cir. 2007) ("[T]he fact-finder's role is to determine whether the employer's decision was objectively reasonable."); *Monroe v. County of Orange*, No. 14-cv-1957 (KMK), 2016 WL 5394745, at *16 (S.D.N.Y. 2016) (same).  This approach accords employers sufficient latitude to make reasonable decisions regarding workplace safety while protecting employees from baseless discrimination.

Juxtaposing these cases against the jury interrogatories in this case puts the issue into clear focus.  The relevant inquiry asked the jury to determine whether "defendant prove[d] by a preponderance of the credible evidence that plaintiff would pose a direct threat to the health and safety of himself or others if assigned as a full duty police officer?"  DE 56.  The charge specifically advised the jury that, to prevail upon its defense, the County would have to prove that plaintiff "poses a significant or substantial risk," and that to reach such a determination, "you must consider the following factors . . . ."  DE 57 at 35-36.

11

In dutifully responding to these questions, the jury was not called upon to decide whether the County had made an objectively reasonable determination as to whether plaintiff was fit to return to full duty.  Rather, the only determination that the members of the jury made was whether they believed that the County proved—after years of litigation and upon a massive trial record—that plaintiff was, in the view of the jurors, a danger to himself or others.  Viewed another way, the jury was asked to substitute its judgment—years after the incidents and decisions at issue—for that of the police department and without any deference to that decision. Furthermore, not only would this *de novo* review provide the basis for money damages for past acts, but additionally, if plaintiff's position were adopted, would form the basis for injunctive relief directing the County to return plaintiff to his full duty patrol position.

As one court observed:

> Significant deference [to an employer's determination regarding danger] is especially appropriate in a situation involving a law enforcement agency, where a mistake may contribute to an erosion in the public's trust in government, cost the state a significant amount of money in *post hoc* litigation, and result in the loss of innocent life.

*Bruzzese v. Lynch*, No. 13-CV-5733, 2016 WL 3220986, at *5 (E.D.N.Y. June 8, 2016).  Other courts have afforded varying degrees of deference to such determinations.  *EEOC v. Amego, Inc.*, 110 F.3d 135, 144–45 (1st Cir. 1997) ("[W]here," in cases such as this, "no evidence of animus is present, courts may give reasonable deference to the employer's assessment of what the position demands." (citing *Doe v. New York Univ.*, 666 F.2d 761, 776 (2d Cir.1981))); *Nelson v. City of New York*, No. 11 CIV. 2732 JPO, 2013 WL 4437224, at *11 (S.D.N.Y. Aug. 19, 2013) ("[C]ourts quite properly accord a significant measure of deference to a police department's determination that an officer poses too great a risk to herself and the public."); *Makinen*, 53 F. Supp. 3d at 695 (S.D.N.Y. 2014) (according "some degree of deference"); *cf. Powell v. Nat'l Bd.*

12

*of Med. Exam'rs*, 364 F.3d 79, 88 (2d Cir. 2004), *opinion corrected*, 511 F.3d 238 (2d Cir. 2004)
("When reviewing the substance of a genuinely academic decision, courts should accord the
faculty's professional judgment great deference.").  The interrogatories, along with the
accompanying instructions, submitted by the parties neither provide any deference to defendant's
determination, nor required any inquiry into the objective reasonableness of that decisional
process.  *See Jarvis*, 500 F.3d at 1121–23 ("[W]e believe that even nonexpert employers should
be protected when they make objectively reasonable assessments, recognizing, of course, that
objective reasonableness may well depend on whether professional advice is obtained"); *cf.*
*Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998) ("In deciding whether an employer
reasonably relied on the particularized facts then before it, we do not require that the decisional
process used by the employer be optimal or that it left no stone unturned.  Rather, the key inquiry
is whether the employer made a reasonably informed and considered decision before taking an
adverse employment action.").

Focusing the jury on a *de novo* determination of "direct threat" based on a broadly
expanded record generated during years of litigation, rather than the reasonableness of the
determination made by officials at the time of that decision, does nothing to advance the central
purpose of the statute, to wit: the eradication of unjustified discrimination.  In this respect, the
record here is particularly poignant: the jury was asked to decide, in 2016, whether this plaintiff
currently poses a threat based on incidents that occurred in 2009.  That the jury answered this
question in the negative cannot be fairly construed to suggest that the police commissioner's
decision in 2010 was tainted by discriminatory animus.

Based on the foregoing, I find that, notwithstanding the failure to object, the deficiencies
discussed above require a new trial, consistent with Rule 51(d)(2).  Said trial will be limited to

the issue of the objective reasonableness of the County's determination and, if appropriate, a new calculation of damages.  Because of this determination, the Court need not consider the County's Rule 50 motion.  Finally, plaintiff's application for injunctive relief is denied without renewal following the retrial.

**CONCLUSION**

Based on the foregoing, because the law requires a new trial on the question of whether the County's determination was objectively reasonable, I hereby grant, in part, the County's motion pursuant to Rule 59.  The County's motion for a directed verdict under Rule 50 is denied. Plaintiff's motion for injunctive relief is denied without prejudice as premature.


**SO ORDERED.**

Dated: Central Islip, New York
        August 31, 2017

                                    /s/ Gary R. Brown_____
                                    Gary R. Brown
                                    United States Magistrate Judge